PEOPLE of the State of Colorado,
Plaintiff-Appellant,

v.

Martin ZAMORA, Defendant-Appellee.

PEOPLE of the State of
Colorado, Petitioner,

v.

The DISTRICT COURT OF the SECOND
JUDICIAL DISTRICT and Lynne M.
Hufnagel, one of the judges thereof,
Respondents.

Nos. 84SA271, 84SA322.

Supreme Court of Colorado,
En Banc.

Feb. 11, 1985.

Norman S. Early, Jr., Dist. Atty., O. Otto Moore, Asst. Dist. Atty., Brooke Wunnicke, Chief Appellate Deputy Dist. Atty., Denver, for plaintiff-appellant and petitioner.

Arthur S. Nieto, P.C., Arthur S. Nieto, Denver, for defendant-appellee and respondents.

ROVIRA, Justice.

In *People v. Zamora,* the People filed an interlocutory appeal challenging the trial court's order granting defendant's motion to suppress evidence. In *People v. District Court,* we issued a rule to show cause why the respondent trial court's order, prohibiting the People from using certain statements obtained from two witnesses, should not be reversed. The events leading up to both orders arise from an information charging Martin Zamora, defendant, with attempt to commit second-degree murder, first-degree assault and second-degree assault. We reverse the challenged order in *People v. Zamora,* and discharge the rule in *People v. District Court.*

I.

The facts surrounding this dispute are set out in detail in the findings of the trial court. Since neither the People nor the defendant dispute these findings, we adopt them for purposes of this opinion. The findings reflect that:

On November 7, 1983, Officer Frederick Hoag ... received a call to go to Denver General Hospital to investigate a possible vehicular assault. He contacted Irene Zamora, also known as Irene Lucero in a room on the eighth floor. She was in guarded condition in the Intensive Care Unit....

According to Officer Hoag's testimony ... Mrs. Zamora stated that she and Pioquinto Ramirez were walking in the alley behind 2558 Lawrence Street on November 5, 1983 at about 2:00 a.m. She stated that her husband, Martin Zamora, deliberately ran over them and then left the scene. She said that Mr. Zamora was driving his car, a 1974 Pontiac Grand Prix, copper with a white top. Mrs. Zamora stated he lived at the Highland Apartments and gave a description of him. Mrs. Zamora told Officer Hoag 'My husband tried to kill me,'....

Officer Hoag ... called headquarters and found that a hit and run report had been completed with regard to this same incident.... This report indicated that another car had been hit but did not indicate that people had been injured.

After leaving Denver General Hospital ... Officer Hoag went to the Highland Apartments.... He looked into the carport for the apartments and saw a vehi-

cle matching the description he had been given of Mr. Zamora's car.... According to his testimony, Officer Hoag checked the license plate, CR 8317, and found it listed to Irene Zamora. There appeared to be damage to the right front of the car. There was what appeared to be paint transfer from another vehicle and the bug deflector or some other mounted object was broken off. After asking for a cover car and the detective assigned to assaults, Officer Hoag spoke to the manager in an effort to find Martin Zamora to arrest him for vehicular assault. The manager had no record of him, but stated he might be living in Apartment # 301. Officer Hoag checked that apartment and a Spanish male who spoke little English answered and said he didn't know Martin Zamora.

Detective John Lopez had arrived and Officer Hoag briefed him on the information he'd received from Irene Zamora. The Detective viewed the Defendant's car and said he wanted it towed. According to Detective Lopez, the Spanish male who answered the door at Apartment # 301 stated that Martin Zamora was on foot in the area with a friend. Officer Hoag recalls it differently—that the neighbor next door who didn't know Mr. Zamora, stated two men had just left Apartment # 301 before the officer arrived. She gave a description of their clothing and said they were Spanish American.

Officer Hoag was filling out the slip to have the Defendant's car towed and waiting for the tow truck when he saw two men who matched the description the neighbor lady had given him about ten minutes earlier. One was trying to put his cowboy hat in a trash container. He matched the description of Martin Zamora given by the victim, his wife, and the description given by the neighbor of one of the people who came out of Apartment # 301. Officer Hoag drove his marked police unit to the two men and the man who had been trying to dispose of his cowboy hat put his hand in his cowboy boot. The officer assumed he

had a weapon in his boot so he pulled his own revolver and told the man to remove his hand from the boot. After telling him again, the officer searched the boot and found a revolver which was seized. When the man provided identification, he proved to be the Defendant, Martin Zamora. Before the Defendant provided his identification, the officer asked him if he was going to shoot and the Defendant said "Yes." All of this conversation was in English. The Defendant then said he needed the weapon for protection because he lived in a rough neighborhood. Officer Hoag advised Martin Zamora he was under arrest for carrying a concealed weapon and for vehicular assault and then handcuffed him. The man with Zamora was released after providing identification.

After Officer Hoag gave the ticket to the tow truckdriver, he drove the Defendant to police headquarters. He did not at any time advise him of his *Miranda* rights.

Based upon these findings, the trial court held that the officer had probable cause to arrest Zamora and the warrantless arrest was justified by exigent circumstances.

All the foregoing took place on November 7, 1983. The following day Detective Lopez questioned the defendant. The court's findings continue as follows:

After Detective Lopez had spoken with the Defendant on November 8, 1983, and done some further investigation, he released the Defendant on November 9, 1983, without filing charges. He testified that he released the Defendant from custody because he thought the case warranted more investigation and the filing of charges in addition to vehicular assault....

The court also found:

When the Defendant was released on November 9, his car was not returned to him. It was retained at the Denver Police Department pound where it had been towed on November 7, 1983, pursuant to a hold placed on it by Detective Lopez.

. . . .

Detective Lopez on November 10, 1983, requested Detective O'Dowd (phonetic) to take a control sample from the Defendant's vehicle and the white car which the Defendant had supposedly hit at 28th and Lawrence. On November 11, Detective O'Dowd did the sampling. No Search Warrant was obtained for the purposes of the sample taken.

The court determined that the seizure of the defendant's vehicle on November 7, 1983, was reasonable, and exigent circumstances justified its seizure without a warrant. However, it then concluded that the police had no right to retain the vehicle after the defendant's release on November 9. Further, the court found that even if the retention was justified, no exigent circumstances existed to justify a warrantless search. Thus, the court ordered suppression of any evidence obtained from inspections or testing accomplished after the defendant's release.

On November 13, Detective Lopez requested dispatch to send a police officer to 2860 W. 32d Avenue, Apartment 301. Concerning this request, the court's findings state:

When first asked about his actions on the morning of November 13, 1983, the Detective testified as follows: 'On the morning of the 13th, during the investigation I felt I had enough to have him [Martin Zamora] arrested and brought to headquarters. I was unable at that point to effect the arrest myself so I just requested through our dispatch to send at least one police car there and have him brought to headquarters.' He testified that he spoke to an officer on the phone and stated the following: 'I gave him a description of [Martin Zamora] and I instructed the officers that anybody in the apartment that even remotely matched Zamora's description that I wanted them brought to headquarters also.... I didn't want the officers bringing the wrong party to headquarters and releasing the suspect inadvertently.'

Officer Johns went to Apartment 301 and brought the defendant and five other men who were in the apartment back to headquarters. Concerning what occurred after the defendant and the other five men were taken into custody, the court stated:

After the six men taken into custody at Apartment #301 were brought to Denver Police Department headquarters, they were interviewed.... Each of the five Spanish American males was given a *Miranda* advisement.... Each was asked if he knew the Defendant, if he lived with him, and if the Defendant had said anything about running over people with his car. When these questions were asked of [Miguel] Perez, Detective Lopez testified that he became very shaken and upset. He further testified that he would not have allowed Mr. Perez to leave at that point because he thought he knew something. Detective Lopez sent ... Perez back to an interview room to calm down and he then spoke with Bernardo Hernandez. Mr. Hernandez told Detective Lopez that he was in the car when the Defendant ran over his wife. The Detective immediately advised him of his *Miranda* rights. Mr. Hernandez continued to discuss the case and stated that he, Miguel Perez, and the Defendant had been drinking at two bars earlier in the evening. The Defendant stated something to the effect of 'let's make a go 'round.' He drove to his wife's home and saw her with Pioquinto Ramirez. He then accelerated and pointed his vehicle at his wife and her friend, running them over. He continued up over the sidewalk. Mr. Hernandez then said, 'Let's go home' and the Defendant drove away and took Mr. Hernandez and Mr. Perez home.

Detective Lopez then spoke to Miguel Perez after advising him of his *Miranda* rights. He confirmed the story Mr. Hernandez had given through an interpreter Detective Lopez had summoned.

The trial court held that while there was probable cause to arrest Zamora on November 13 there were no exigent circumstances justifying his arrest without a war-

rant. It therefore granted the defendant's motion to suppress his arrest without a warrant. The court then considered the defendant's motion to suppress the testimony of Hernandez and Perez, and stated:

The Defendant's Motion in Limine, which the Court is treating as a Motion to Suppress the Statements of Bernardo Hernandez and Miguel Perez, is granted, the Court finding that these statements are the result of the exploitation of the Defendant's illegal arrest.... The People shall not use the statements given by these witnesses in their case-in-chief nor shall they be permitted to call these witnesses at trial to repeat the statements they made to law enforcement officers on November 13, 1983.

## II.

We first consider the interlocutory appeal which presents us with the question of whether the trial court erred in suppressing the evidence obtained from the inspection and testing of the automobile on November 11, two days after the defendant's release.

The People present three arguments: (1) the automobile was lawfully seized and the release of the defendant from custody did not mandate that the automobile should be immediately returned to him; (2) no warrant was necessary because the paint observed on the automobile was in plain view; (3) the defendant has no standing to challenge the search because the automobile was registered in the name of Irene Zamora.

The defendant contends that although a sampling of evidence conducted after the release of a suspect is not automatically to be suppressed, there were no special circumstances here which justified the warrantless search of the automobile. He further contends that the retention of the automobile after his release was illegal.

Neither party challenges the validity of the initial seizure of the automobile. The sole issue is whether the warrantless search of the exterior of the automobile

after the release of the defendant violated his constitutional rights.

 Not every warrantless search is unconstitutional. A warrantless search of an automobile may be valid absent exigent circumstances and even though not incident to an arrest. *See Cooper v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). However, the fact that an object has been validly seized does not in and of itself render valid its subsequent warrantless search. *Id.* at 61, 87 S.Ct. at 790. The validity of a warrantless search of an object which was validly seized is dependent upon the reason for and nature of the custody of the object. *Id.* Thus, it is necessary to review the reason for and the nature of the custody of the automobile in question.

The automobile was seized because it fit the description given to Officer Hoag of the vehicle which was used during the alleged attempted murder. The car was not seized because of the possibility that it contained evidence of a crime, but because it was believed to be the instrumentality of a crime.

 When an object is lawfully seized and the police have a reasonable belief that the object is itself evidence of the commission of a crime, a subsequent examination of the object made proximate in time to the seizure, and undertaken for the purpose of determining its evidentiary value, is not an unlawful search. *See United States v. Johns*, —— U.S. ——, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985); *Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974); *United States v. Conboy*, 337 F.Supp. 517 (S.D.N.Y.1971); *Salazar v. State*, 82 N.M. 630, 485 P.2d 741 (Ct.App. 1971); *State v. Lewis*, 22 Ohio St.2d 125, 258 N.E.2d 445, *cert. denied*, 400 U.S. 959, 91 S.Ct. 359, 27 L.Ed.2d 268 (1970); *People v. Teale*, 70 Cal.2d 497, 450 P.2d 564, 75 Cal.Rptr. 172 (1969); *State v. McKnight*, 52 N.J. 35, 243 A.2d 240 (1968). Since the initial seizure was legal and since the reason for and nature of the custody of the automobile was to use it as evidence, the

subsequent warrantless search was not unconstitutional.

■ Furthermore, the police were not required to release the automobile merely because they released the defendant. The seizure of the automobile was independent from the arrest of the defendant. The car was seized because the police believed it was the instrumentality of a crime. The defendant was arrested because the police believed he committed a crime. Even though the police may not have had sufficient evidence that the defendant was the individual who committed the crime to warrant his continued custody, they did have sufficient evidence that the vehicle was the instrumentality of a crime to warrant its continued impoundment.

Since we hold that the warrantless search of the automobile was valid because it was legally seized as evidence itself, we need not discuss the People's contention that the search was valid under the plain view doctrine or that the defendant lacks standing to challenge the search.

## III.

Next we consider our rule to show cause.

The People admit that Detective Lopez overstepped his authority by ordering Officer Johns to bring to police headquarters all the occupants of Apartment 301, but they argue that the statements obtained from Hernandez and Perez resulted from their illegal arrest, and not from the illegal arrest of the defendant. Thus, they contend that the defendant does not have standing to challenge the admission of the statements because they were not obtained pursuant to a violation of his constitutional rights. The defendant claims that he does have standing because the evidence he seeks to have excluded was obtained as a result of the exploitation of his illegal arrest.

■ The defendant's fourth amendment rights were clearly violated by his November 13 arrest. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Furthermore, the fourth amendment rights of Hernandez and Perez were violated by their seizure.[1] However, both parties recognize that the defendant's right to challenge statements made by Hernandez and Perez is dependent upon whether the statements were obtained as a result of the defendant's unlawful arrest. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *People ex rel. D.E.J.*, 686 P.2d 794 (Colo.1984). Thus, the question is whether the unlawful arrest of Hernandez and Perez arose from the defendant's unlawful arrest or whether their arrests were independent of the defendant's. Stated another way: Before the defendant can have the statements made by Hernandez and Perez suppressed, he must establish that their arrest arose from and was directly dependent upon his illegal arrest.

Officer Johns was the officer who actually brought the defendant and the five other men, including Hernandez and Perez, to headquarters. Johns acted pursuant to a request by Detective Lopez.

Concerning the November 13 seizure of the defendant and the witnesses, Detective Lopez testified:

Q: How was it that Mr. Zamora came to be at police headquarters?

---

1. Also, the fourth amendment rights of Zamora, Hernandez, Perez, and each of the other three men who were arrested on November 13, 1983, were violated by the warrantless entry into Apartment 301. The record indicates that all six men lived in the apartment. In its findings, the trial court referred to the men as roommates. On the morning of the mass arrest, all were apparently sleeping at the premises when the police arrived.

Although it appears that Zamora did live at the apartment, his residence is somewhat un-

clear. The trial court's findings state that when Officer Hoag went to Apartment 301 on November 7, 1983, a Spanish male who spoke little English answered and said he didn't know Martin Zamora. The findings also state that when Officer Hoag questioned the manager of the Highland Apartments, he had no record of Zamora, although he stated that Zamora might be living in Apartment 301. Thus, although the record does not establish who the apartment was leased to, it apparently was not leased to Zamora.

A: On the morning of the 13th, during the investigation, I felt I had enough to have him arrested and brought to headquarters. I was unable at that point to effect the arrest myself so I just requested through our dispatch to send at least one police car there and have him brought to headquarters.

Q: Were some other people brought to headquarters along with him?

A: Yes, there were five or six other people that were brought to headquarters. When I spoke with one of the officers on the phone, I told him that the people in the apartment were all illegal, that chances were that nobody spoke English, and I gave him a description of Mr. Zamora and I instructed the officers that anybody in the apartment that even remotely matched Zamora's description, that I wanted them brought to headquarters also.

Q: Why did you want all of these people brought to headquarters?

A: Well the officers didn't have a picture of Mr. Zamora, and pretty much all of the people in the apartment matched the general description of Mr. Zamora, and I didn't want the officers bringing the wrong party to headquarters and releasing the suspect inadvertently.

. . . .

Q: Officer, earlier you testified, when you were initially asked about the pickup of the individuals on November 13th of 1983 at 2860 West 32nd, you stated that the reason that you told the officers to pick everyone up in there is because you wanted to make sure that they got the right person. Is that true?

A: Correct.

Q: But isn't it also true, Officer, that that wasn't your only reason for having everyone picked up? You also wanted to talk with everyone there, isn't that true?

A: Yes, sir.

Concerning the seizure Officer Johns testified:

Detective Lopez stated to me that we were to inquire if there was a Martin Zamora in the apartment complex or in the apartment specifically. If he was, to transport him and all other parties in the apartment to headquarters.

. . . .

When we first entered the premises, I had to verify whether Mr. Zamora was actually there. That was the individual who supposedly was in the apartment, and we based everything around him.

. . . .

He [Detective Lopez] just told me that this Mr. Zamora was in the apartment. If he was there, I was to ID him and take him down, along with the rest of the people in the apartment.

Based upon the testimony of Lopez and Johns, the trial court found:

Officer Ronald Johns testified that he received a call to go to this apartment from Detective Lopez. His recollection is that he was to transport any and all individuals in the apartment to headquarters for Lopez and that he was to inquire for Martin Zamora. He received no information as to the type of investigation Lopez was conducting and says he couldn't swear to why he was to transport all the people in Apartment # 301 to headquarters.

This statement indicates that the trial judge found that Hernandez and Perez would have been brought to headquarters regardless of whether the defendant was present in the apartment; their arrests were independent of the defendant's.

Later in the order, the trial court, without any further discussion of the facts concerning the arrest of the witnesses, found that the statements were "the result of the exploitation of the Defendant's illegal arrest." This statement indicates that the trial judge found that the arrests of Hernandez and Perez were dependent on the defendant's.

The only specific finding concerning the facts surrounding the November 13 "round-up" of the six men was the statement that, "His [Johns] recollection is that he was to transport any and all individuals in the apartment to headquarters for Lopez and that he was to inquire for Martin Zamora." The trial court also found that Lopez had issued "an order for a mass arrest."

Lopez testified that he requested all individuals in the apartment to be brought into headquarters and that he not only wanted the defendant brought in but also wanted any other individuals in the apartment brought in because they might be able to supply information. Thus, Lopez' testimony could be interpreted to mean that he wanted the witnesses brought in regardless of the defendant's presence.

Johns's testimony was that he was to bring in everyone if the defendant was present. His testimony could be interpreted to mean that he was to ascertain whether the defendant was present and, if he was, to bring in everyone in the apartment to avoid the possibility of letting Zamora slip away.

Because of the different interpretations that can be made of the testimony of Lopez and Johns, and because of the inconsistent findings of the trial court, we believe that it is appropriate to remand to the trial court for further findings and such additional evidence as the court may, in its discretion, permit.

In *People v. Zamora*, the order is reversed. In *People v. District Court*, the rule to show cause is discharged and the case remanded.

QUINN, J., dissents as to *People v. District Court*, and DUBOFSKY and NEIGHBORS, JJ., join in the dissent.

QUINN, Justice, dissenting in part:

I dissent in *People v. District Court of the Second Judicial District* (No. 84SA322) from that part of the court's opinion which directs the respondent court to make additional findings with respect to the defendant's motion to suppress verbal evidence. The respondent court, in my view, correctly determined that the governmental acquisition of testimonial evidence from two persons, Bernardo Hernandez and Miguel Perez, was the direct fruit of the police officers' unconstitutional entry into the defendant's home for the purpose of effectuating the defendant's warrantless arrest inside the home. I see no need for further findings, nor is there any reason to take additional evidence, under the circumstances disclosed by the record.

I.

The testimony at the suppression hearing established the following sequence of events. Officer Johns, acting under the direction of Detective Lopez, went with two other officers to an apartment building at 2860 West 32nd Avenue in Denver, Colorado, for the purpose of making a warrantless arrest of the defendant, Martin Zamora, and transporting him and all other persons in the apartment to police headquarters. When the officers arrived at the apartment building they went to apartment number 301, where Zamora lived, and were admitted into the apartment. Once inside, the officers observed that there were five other persons in apartment 301. They asked each person for identification. Upon receiving identification from Zamora, they handcuffed him and transported him and the other five persons, including Bernardo Hernandez and Miguel Perez, to police headquarters. Statements incriminating Zamora were ultimately taken from Hernandez and Perez after they were subjected to custodial interrogation at the stationhouse.

The respondent court, after making findings of fact essentially in accord with the above sequence of events, suppressed the trial testimony of Hernandez and Perez during the prosecution's case in chief. It ruled as follows: that the warrantless arrest of the defendant inside his home was in violation of the Fourth Amendment; that the governmental acquisition of the verbal evidence from Hernandez and Perez

was the result of the exploitation of the defendant's illegal arrest; that the challenged evidence did not originate in a source independent of the Fourth Amendment violation; and that the verbal evidence would not have been inevitably discovered by the police. Because the court's findings are adequately supported by the record and because the court employed the correct legal standards in resolving the suppression issue, I am unable to discern any basis in fact or law to require further proceedings on this matter.

## II.

In *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the Supreme Court held that, as in the case of tangible objects, visual observations and verbal evidence are no less within the scope of the exclusionary rule when acquired as the result of a Fourth Amendment violation:

> The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion. It follows from our holding in *Silverman v. United States,* 365 U.S. 505 [81 S.Ct. 679, 5 L.Ed.2d 734 (1961)], that the Fourth Amendment may protect against the overhearing of verbal statements as well as against the more traditional seizure of "papers and effects." Similarly, testimony as to matters observed during an unlawful invasion has been excluded in order to enforce the basic constitutional policies. *McGinnis v. United States,* 227 F.2d 598 [ (1st Cir.1955) ]. Thus, verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the "fruit" of official illegality than the more common tangible fruits of the unwarranted intrusion.

371 U.S. at 485, 83 S.Ct. at 416. The appropriate question in such a case is whether, granting the establishment of the primary illegality, the challenged evidence has been acquired by the exploitation of the illegality or, instead, by means sufficiently distinguishable to be purged of the primary taint. *E.g., Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417; *People v. Hogan,* 649 P.2d 326, 332 (Colo.1982).

In *United States v. Ceccolini,* 435 U.S. 268, 276–78, 98 S.Ct. 1054, 1060–61, 55 L.Ed.2d 268 (1978), the Supreme Court, while reaffirming the basic principles of *Wong Sun,* noted that there is less reason to invoke the exclusionary sanction when the constitutional challenge is to live-witness testimony than there is in the case of an inanimate object. As stated by the Court:

> Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet. Witnesses can, and often do, come forward and offer evidence entirely of their own volition. And evaluated properly, the degree of free will necessary to dissipate the taint will very likely be found more often in the case of live-witness testimony than other kinds of evidence. The time, place and manner of the initial questioning of the witness may be such that any statements are truly the product of detached reflection and a desire to be cooperative on the part of the witness. And the illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify.
>
> \* \* \* \* \* \*
>
> Another factor which not only is relevant in determining the usefulness of the exclusionary rule in a particular context, but also seems to us to differentiate the testimony of all live witnesses—even putative defendants—from the exclusion of the typical documentary evidence, is that such exclusion would perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search or the evidence discovered thereby.
>
> \* \* \* \* \* \*
>
> In short, since the cost of excluding live-witness testimony often will be greater,

a closer, more direct link between the illegality and that kind of testimony is required.

In holding that there was sufficient attenuation between an alleged search of an envelope belonging to Ceccolini and the governmental acquisition of the trial testimony of a witness, the Supreme Court focused on the following factors: (1) the degree of free will exercised by the witness in providing information to the law enforcement officers; (2) the proximity or remoteness between the illegal search and the initial contact with the witness and the acquisition of testimonial evidence; (3) prior knowledge on the part of law enforcement officers of the identity of the witness and the witness' relationship to the accused; (4) the culpability and wrongful intent, if any, of the officers in conducting the illegal search; and (5) the deterrent effect which the exclusionary rule would have on the behavior of law enforcement officers in similar circumstances. 435 U.S. at 279–80, 98 S.Ct. at 1061–62.

### III.

The record in this case fully supports the conclusion that the government's acquisition of the challenged evidence was the fruit of the unconstitutional entry into the defendant's home and did not originate in some untainted and independent source. The officers' entry into the apartment was not based on exigent circumstances, was for the specific purpose of making a warrantless arrest of the defendant inside his home, and, as the majority concedes, was an obvious violation of the defendant's Fourth Amendment rights. In terms of intrusiveness, the entry was different only in degree, but not in kind, from a warrantless entry into a home in order to search. *Payton v. New York*, 445 U.S. 573, 589, 100 S.Ct. 1371, 1381, 63 L.Ed.2d 639 (1980). It was this unlawful entry that led directly to the officers' observation of the five other persons inside the apartment, which observation in turn resulted in the immediate confinement and interrogation of the occupants and eventually in the governmental acquisition of verbal statements and prospective testimony from Hernandez and Perez.

That the officers may also have illegally arrested the five occupants inside the apartment does not undo the fact that the source of that illegality was the entry into the defendant's apartment in violation of the Fourth Amendment. The concomitant violation of the constitutional rights of all the occupants of the apartment serves only to highlight the scope and breadth of the unlawful police conduct. Irrespective of whether the officers would have arrested the five other occupants in the event the defendant had not been present in the apartment, the irrefutable facts are that the defendant was present in the apartment, that his Fourth Amendment rights were violated by the officers' entry into the apartment, that the officers observed the five other occupants inside the apartment as the direct and immediate result of the illegal entry, that the five occupants were taken into police custody, and that statements incriminating the defendant were obtained from Hernandez and Perez during custodial interrogation.

The record further supports the conclusion that the verbal evidence obtained from Hernandez and Perez would not have been inevitably discovered by the police. Once a Fourth Amendment violation is established, the burden is on the prosecution to establish by a preponderance of the evidence that the challenged evidence would have inevitably been discovered by lawful means. *Nix v. Williams*, —— U.S. ——, 104 S.Ct. 2501, 2509–10, 81 L.Ed.2d 377 (1984). It would be utter speculation to infer that, had not the unlawful entry been made into the defendant's apartment, Officer Johns and the two other officers would somehow have come upon Hernandez and Perez by lawful means and obtained the very same evidence which the trial court suppressed as the product of their illegal actions. The respondent court declined to engage in such speculation in its ruling and properly so.

The only remaining question is whether the respondent court properly resolved the

issue of attenuation in accordance with controlling constitutional precedent. Given the short and straight line between the officers' violation of the defendant's Fourth Amendment rights and the acquisition of verbal evidence from Hernandez and Perez, I am satisfied that the respondent court properly concluded that there were no intervening events sufficient to purge the verbal evidence of initial illegality. Both Hernandez and Perez were interrogated at the stationhouse under somewhat coercive circumstances, with little opportunity for the exercise of their free will in divulging information to the police. *See Ceccolini,* 435 U.S. at 276, 98 S.Ct. at 1060; *Wong Sun,* 371 U.S. at 486, 83 S.Ct. at 416. Moreover, there is nothing of record indicating that the identity of these witnesses was known to law enforcement officers prior to the illegal arrest. *See Ceccolini,* 435 U.S. at 279, 98 S.Ct. at 1061; *Wong Sun,* 371 U.S. at 487–88, 83 S.Ct. at 417–18. Finally, the trial court expressly found that the mass arrest of both the defendant and the five other persons originated in Detective Lopez' "hunch" that he could thereby obtain more information about the case. Where, as here, an illegal entry and arrest were effectuated for the specific purpose of discovering potential witnesses and under circumstances manifesting an extreme indifference to basic constitutional rights, application of a broader exclusionary sanction to live-witness testimony than might otherwise be the case is warranted. *See Ceccolini,* 435 U.S. at 276 n. 4, 98 S.Ct. at 1060 n. 4. In short, the respondent court's resolution of the suppression issue was in accord with recognized attenuation analysis.

I would simply discharge the rule to show cause in *People v. District Court of the Second Judicial District* and would not require additional findings on the suppression issue.

I am authorized to say that DUBOFSKY and NEIGHBORS, JJ., join me in this dissent.