OPINION OF THE COURT
Howard E. Goldfluss, J.
The defendant, by his motion, seeks to extend the "poisonous fruit” doctrine promulgated by the United States Supreme Court in Wong Sun v United States (371 US 471) to a level which has not as yet been reached in the courts of New York State. His position is that after a finding has been made that an arrest lacks probable cause — and that no attenuating or intervening circumstances exist which could deter the conclusion that such arrest leads directly to his in-court identification — then such identification must be suppressed.
Concededly, the remedy he seeks is extreme, but after carefully considering both the underlying thrust of Wong Sun *156 and its progeny and the specific facts of this case, this court is constrained to grant such a motion.
On October 4, 1976, a robbery was committed in Bronx County wherein a firearm was taken from a security guard. Detective Edward Muller testified at a hearing held, in connection with this motion, that after the incident he interrogated the witnesses and brought them to the 48th Precinct to view photographs at the Bronx Photo Unit. The two witnesses, John Casey and Carlton Edwards, viewed a minimum of 1,000 photographs on the day of the occurrence. No identification was made of the perpetrator or perpetrators at that time, or at subsequent times when the witnesses viewed "numerous selected photographs”.
On or about December 30, 1976, the defendant was either the driver or a passenger in an automobile in Suffolk County. He was placed under arrest for the possession of a weapon after the car was stopped by the police and a search ensued.
After examining the weapon, the Suffolk County Police Department discovered that the serial number indicated it was the same Colt revolver which was seized from the security officer in the Bronx robbery three months earlier. Detective Muller was informed by the Suffolk County detective of this discovery and after having been so informed he prepared an array containing the photographs of the defendant Irving Pleasant, the other two occupants of the car in the Suffolk County arrest, and others. He exhibited the array to witnesses Edwards and Casey. They then identified the defendant Pleasant and another occupant of the car, La Borde, as being the perpetrators of the Bronx robbery. This identification was made on March 9, 1977 — six months after the Bronx incident. Witness Casey identified the defendant Pleasant as the one who "took my gun and handcuffed me”.
After this identification was made, Detective Muller secured a warrant of arrest for Pleasant and the other perpetrator La Borde, and took both into custody from the Supreme Court in Suffolk County and transported them to the Bronx Robbery Squad where a lineup was conducted. The witness Casey again identified Pleasant.
There is only one logical conclusion that this court can draw from Detective Muller’s testimony, namely, that there is a direct line between the arrest of the defendant and the identification by the witnesses, and that other than the arrest, there is no independent source or attenuating circumstance *157 intervening which could possibly be a causal connection between the two.
On December 11, 1978, the Appellate Division, Second Department, reversed the conviction of Pleasant and La Borde in the Suffolk County case (see People v La Borde, 66 AD2d 803), on the specific grounds that no probable cause existed for the vehicle stop and the arrest and for this reason the lower court erred in not suppressing the gun — the very same weapon stolen from the security guard in the Bronx robbery. Clearly the question of the gun’s suppression has been decided, is the law of the case, and is no longer an issue.
 In determining the relief requested by the defendant, the doctrine of extension of the exclusionary rule found in Wong Sun must be spelled out to determine its applicability herein. Basically, Wong Sun made indirect as well as direct products of unlawful search the subject of suppression. (See, also, Silverthorne Lbr. Co. v United States, 251 US 385.) The "poisoned fruit” theory has as its premise that knowledge garnered by the government’s own wrong cannot be used by it at all, if no independent source exists. The Fourth Amendment protects against the overhearing of verbal statements as well as the more traditional seizure of "papers and effects” (see Silverman v United States, 365 US 505). Also, testimony observed during an unlawful invasion has been excluded (see McGinnis v United States, 227 F2d 598). In Wong Sun, the court made no distinction between physical and verbal evidence. Justice Brennan, writing for the majority, emphasized that no distinction can logically exist (371 US 471, 486, supra): "Either in terms of deterring lawless conduct by federal officers, Rea v. United States, 350 U.S. 214), or of closing the doors of the federal courts to any use of evidence unconstitutionally obtained [citation omitted], the danger in relaxing the exclusionary rules in the case of verbal evidence would seem too great to warrant introducing such a distinction.”
Prior to its decision in Wong Sun, the Supreme Court held in Nardone v United States (308 US 338) that the causal connection between the illegally received evidence and the People’s proof can be attenuated to such a degree that the taint is dissipated. Wong Sun adopted that holding when the court specifically refused to carve in stone the proposition that "all evidence is 'fruit of the poisonous tree’ simply because it would not have come to light but for the illegal actions of the police.” (371 US 471, 487-488, supra; italics supplied.) The *158 court considered that the more important question to decide was whether the objected to evidence had been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.
However, the People urge that the taint is not the primary issue, but that the proffering of a living witness cannot be mechanically equated with the proffering of inanimate evidentiary objects illegally seized. In other words, if the unlawful actions of the police lead to a live and willing witness, the testimony of such witness may not be gagged by an exclusionary rule (see People v Mendez, 28 NY2d 94). To further advance this position, the People cite the decision of the United States Supreme Court in United States v Ceccolini (435 US 268). The court therein refused to adopt a "per se” or "but for” rule that would bar any evidence, whether tangible or eyewitness testimony, which came to light through a causal relationship beginning with an illegal arrest. It held further that the exclusion of a witness’ testimony given voluntarily, which in fact would disable that witness from testifying about relevant and material facts, was too great for an even handed system of law enforcement to bear in order to secure a negligible and speculative deterrent effect on police.
The key words which distinguish the Ceccolini case from the facts herein are "negligible” and "speculative”. In Ceccolini, a police officer was present in defendant’s shop talking to the defendant’s employee. The officer noticed an envelope with money protruding therefrom lying on the cash register. He examined it and saw that it contained policy slips as well as money. He did “this outside the presence of the employee, and did not disclose to that employee what he had seen and done. He then inquired of the employee as to who owned the envelope. She replied that it was the defendant. The police officer reported his finding to the local detectives, and the FBI who interviewed the employee four months later without referring to the police officer. Approximately 18 months later, the defendant Ceccolini was summoned before a Grand Jury and testified that he had never taken policy bets at his shop. The employee testified to the contrary. Ceccolini was indicted for perjury.
The District Court granted the defendant’s motion to suppress the employee’s in-court testimony on the Wong Sun "poisoned fruit” theory. The Circuit Court of Appeals affirmed, relying strongly on their finding that the "road” to the em *159 ployee’s testimony from the concededly unconstitutional search was both "straight and uninterrupted”.
The Supreme Court reversed, stating that facts improperly obtained did not necessarily become inaccessible. But significantly the court also held that the usage of such testimony would necessarily have to be based upon facts from which the court could logically conclude that the discovery of the challenged evidence had become so attenuated sis to dissipate the taint.
In Ceccolini, the issue was not whether the live witness’ testimony could be suppressed, but whether the illegality of the taint was in fact attenuated by intervening factors which could permit the testimony to be accepted. The court concluded that the evidence indicated overwhelmingly that the testimony of the witness was given independent of official authority (i.e., the officer’s discovery of the policy slips). The fact was that the witness was totally unaware of this discovery, and therefore there was no direct road from the original illegality to the witness’ testimony. Clearly, in Ceccolini, a finding of attenuation can be justified by the lapse of time and circumstance.
The People also rely on People v Almestica (42 NY2d 222, 224), but that court also found the victim’s testimony "completely independent of and not tainted by the unlawful search.” Specifically, the issue in Almestica was one of harmless error, and the court determined that the admission of the evidence resulting from the unlawful search — although an error of constitutional dimension — did not require reversal as a matter of law. The court reasoned that the addition of the tainted evidence to the testimony of the eyewitness would be at best of negligible significance.
 There is no analogy here to Ceccolini or Almestica. There is nothing "negligible” or "speculative” about the connection between the unlawful stop of the car — Pleasant’s unlawful arrest — the unlawful seizure of the gun — the ensuing lineup identification — and the proposed in-court identification. Nor can this connection, by any stretch of the imagination, be characterized as of "negligible significance”. On the contrary, the road from the initial illegality is straight and true, without any detours which could justify a finding that attenuation or intervening factors existed.
The defendant’s position becomes even more credible when the standard set forth by the United States Supreme *160 Court in Fahy v Connecticut (375 US 85) is applied. In Fahy, the court mandated compulsory reversal if, "there is a reasonable possibility that the evidence complained of might have contributed to the conviction” (supra, pp 86-87; emphasis added). As Judge Cooke pointed out in his dissent in Almestica (42 NY2d 222, 228, supra), this is not merely a "legal residuum” rule, wherein it is possible to subtract out the tainted evidence and still arrive at a guilty verdict.
The Supreme Court further enunciated and expanded on the standard set in Fahy when it decided Dunaway v New York (442 US 200), in June, 1979. The issue was raised therein in connection with a confession, which although given in response to correctly articulated Miranda warnings, was nevertheless suppressed because the arrest was illegal and there existed a causal connection between the illegal seizure and the confession.
In Dunaway, the court reiterated its previous holding in Brown v Illinois (422 US 590), wherein it decreed that the exclusionary rule serves different interests and policies when applied to the Fourth Amendment and different interests when applied to the Fifth. Thus, Miranda warnings, by themselves, did not attenuate the taint of an unconstitutional arrest, for if allowable, the purpose and effect of the exclusionary rule would have been sufficiently .diluted. The real issue, again, was the degree of causal connection and the presence or absence of intervening circumstances.
The People argue that Dunaway’s rationale cannot possibly apply to animate testimonial evidence by a live and willing witness. They urge that courtroom identification testimony is not suppressible evidence, and that such testimony presupposes the defendant’s presence at trial, and therefore the "evidence” cannot ripen until trial.
The People’s position is not tenable because the defendant himself — or at least his presence in court making him subject to identification — is the poison fruit directly resulting from the original illegality. Wong Sun made it clear that testimony is a proper target for Fourth Amendment protection (see Wong Sun v United States, 371 US 471, 485, supra). The Supreme Court has clearly stated that all types of identification evidence — testimony at pretrial lineup, showup, photographic array and confirming an in-court identification — are the proper subjects of a suppression motion under the Fourth, Fifth and Sixth Amendments (see Johnson v Louisiana, 406 *161 US 356; Stovall v Denno, 388 US 293; Gilbert v California, 388 US 263; United States v Wade, 388 US 218; see, also, Payne v United States, 294 F2d 723; Crews v United States, 389 A2d 277 [DC App]).
The undeniable fact here is that absent the illegally seized gun, the People have made no showing that there was any other source which caused the seizure of the defendant’s person. Testimonial evidence of his identification in court would come about by direct exploitation of the unlawful search and seizure — because it was discovered by and made available to the People through — and is an unattenuated product of — an unlawful act (see United States v Paroutian, 299 F2d 486).
The People strongly argue that the independent source exception referred to by the court in Ceccolini applies here, in that Casey and Edwards are capable of identifying Pleasant without regard to pretrial identification procedure or by what means he comes into court.
The problem with that argument is that it confuses the "independent source” doctrine with due process requirements. Clearly, when identification testimony is in issue, the Supreme Court has set down as its prevalent standard the "reliability of the identification” (see Manson v Brathwaite, 432 US 98; Neil v Biggers, 409 US 188; Simmons v United States, 390 US 377). The Fifth Amendment question is whether, under the totality of the circumstances, the witness’ identification is reliable enough, based on a previous independent observation of the defendant, to withstand challenge on the ground that the pretrial procedure distorted the witness’ perception. Such "reliability” can be the basis for a finding of "independent source” — independent of any other tainted pretrial procedure (see Clemons v United States, 408 F2d 1230).
 The Fourth Amendment concern, however, is not reliability of the evidence as much as deterrence of illegal police activity by exclusion of unlawfully obtained evidence (see Brown v Illinois, 422 US 590, supra). The Fourth Amendment has a different type of independent source exception. In Wong Sun, the court stated (371 US 471, 488, supra) that all evidence which is the product of — or has " 'come at by exploitation of ” — official misconduct can have no independent source if it is dependent on and derived from the violation of Fourth Amendment rights itself. It must be excluded — no *162 matter how reliable — if it is directly traceable to — or is causally related to unlawful official behavior.
There is a further distinction. A Fifth Amendment violation does not occur until unreliable evidence is introduced at trial. Therefore, the defendant’s due process rights are protected if a witness’ ability to testify shows reliability— irrespective of any suggestiveness (see Manson v Brathwaite, supra; Neil v Biggers, supra). Once reliability has been established, pretrial taint cannot cause a Fifth Amendment violation.
A Fourth Amendment transgression becomes an accomplished fact at the time of the illegal search and seizure. Unless all testimony is suppressed, including lineup identification and in-court identification which is obtained by unlawful arrest leading to witness confrontation, the fruit of the illegality will surface at trial. There is no exception which can sanction the reception of such evidence. The Fourth Amendment exclusionary rule is calculated to prevent, not to repair —to deter, not to remedy. The only effective way to compel respect for its constitutional guarantee is to remove the incentive to disregard it. Judge Cooke in his dissent in Almestica emphasized that tainted and untainted evidence present a composite picture. To cull out tainted evidence — examine a sparser picture — and then construct a legally acceptable picture — is in effect creating a facade.
Since there is no attenuation which can serve to purge the taint in this case, this court must strictly construe the Fourth Amendment in favor of the defendant. Judicial surgery cannot eliminate the poison. It matters not how it is dissected — or disguised — or labeled — the admission of any identification testimony would be a condonation of an illegality. Such a result would not only frustrate the goal of deterrence, but would emasculate the essence and meaning of the Fourth Amendment itself.
Motion to suppress testimony of lineup and in-court identification is granted.