CAVANAGH, J.
(dissenting). I respectfully dissent from today’s decision. In this case, we are called to implement a federal district court’s order stemming from defendant’s petition for a writ of habeas corpus. Rather than genuinely attempting to execute the federal court’s order in our courts, the majority disputes the basis of the order itself and, as a result, frustrates its intended effect.
From the outset, the majority needlessly criticizes the federal district court’s legal analysis. We are bound by the district court’s holding that defendant’s incarceration violated the United States Constitution be *257 cause the interrogation of defendant violated his Sixth Amendment rights. We are equally bound to enforce the remedy the district court ordered — the exclusion of defendant’s confession from any retrial. A judgment in a habeas corpus proceeding is res judicata with regard to the issues of law and fact necessary to reach the conclusion that the prisoner was illegally in custody. Collins v Loisel, 262 US 426, 430; 43 S Ct 618; 67 L Ed 1062 (1923). A state supreme court “may not... reexamine and decide a question which has been finally determined by a court of competent jurisdiction in earlier litigation between the parties.” City of Tacoma v Taxpayers of Tacoma, 357 US 320, 334; 78 S Ct 1209; 2 L Ed 2d 1345 (1958).
Aside from the constraints of res judicata, the federal district court’s enforcement power prevents us from deviating from its conditional grant of defendant’s petition for a writ of habeas corpus. When conditionally granting a writ of habeas corpus, a federal district court retains jurisdiction to determine whether a party has complied with the terms of its order. Gentry v Deuth, 456 F3d 687, 692 (CA 6, 2006). A state’s failure to timely cure the error identified by a federal district court in its order justifies the release of the prisoner. Id. Accordingly, unless defendant’s trial comports with the federal district court’s order, he should be released from custody.
Because we are bound to follow the federal district court’s order, any statements adopting or disavowing the basis of the order are inconsequential; they cannot influence any decision before us.[1] The majority’s dis *258 avowal and criticism of the district court’s application of United States v Cronic, 466 US 648; 104 S Ct 2039; 80 L Ed 2d 657 (1984), are mere dicta. “[Statements concerning a principle of law not essential to determination of the case are obiter dictum and lack the force of an adjudication.” Roberts v Auto-Owners Ins Co, 422 Mich 594, 597-598; 374 NW2d 905 (1985) (citation omitted). Similarly, the Court of Appeals endorsement of the district court’s ruling was also dicta and could have simply been vacated as such.[2] But unlike the Court of Appeals dicta, the majority’s dicta is an obstacle to our task — implementing the district court’s order in state court proceedings. By questioning the validity of the district court’s order excluding defendant’s confession from the outset, the majority effectively eliminates the possibility of excluding evidence derived from the confession — the very matter we are called upon to decide.
I. THE EXCLUSIONARY RULE IN SIXTH AMENDMENT CASES
We are presented with the question whether, when a confession has been obtained in violation of a defendant’s Sixth Amendment rights but without police misconduct, the exclusionary rule applies to live-witness testimony that is derived from the tainted confession. The exclusionary rule has long been employed as a remedy for violations of the Sixth Amend *259 ment right to counsel. United States v Wade, 388 US 218, 240-241; 87 S Ct 1926; 18 L Ed 2d 1149 (1967); Massiah v United States, 377 US 201, 207; 84 S Ct 1199; 12 L Ed 2d 246 (1964). “Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests.” United States v Morrison, 449 US 361, 364; 101 S Ct 665; 66 L Ed 2d 564 (1981).
[W]hen before trial but after the institution of adversary proceedings, the prosecution has improperly obtained incriminating information from the defendant in the absence of his counsel, the remedy characteristically imposed is not to dismiss the indictment but to suppress the evidence or to order a new trial if the evidence has been wrongfully admitted and the defendant convicted. [Id. at 365.]
The nature of a Sixth Amendment violation supports the use of the exclusionary rule even when the violation occurs because of defense counsel’s ineffectiveness or absence rather than government misconduct. “[T]he Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial.” Strickland v Washington, 466 US 668, 684; 104 S Ct 2052; 80 L Ed 2d 674 (1984). “[T]he right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.” Cronic, supra at 658.
The rule distilled from federal authority is that the remedy for Sixth Amendment violations should be tailored to the circumstances to assure the defendant a fair trial. Morrison, supra at 364. In fashioning an appropriate remedy, the federal approach has been “to identify and then neutralize the taint by tailoring relief *260 appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial.” Id. at 365. In this case, the federal district court ruled that “the only appropriate remedy is to not allow use of [defendant’s] tainted statements, should the State decide to initiate a new trial in this matter.” Frazier v Berghuis, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued August 6, 2003 (Docket No. 02-CV-71741DT), slip op at 7. The district court recognized that the only proper remedy that would afford defendant a fair trial, while not entirely foreclosing the state’s ability to prosecute defendant, was to apply the exclusionary rule to defendant’s statements.
The majority contends that an application of the exclusionary rule is inappropriate in the absence of governmental misconduct. Ante at 250. But as I noted in People v Goldston, 470 Mich 523, 562; 682 NW2d 479 (2004) (CAVANAGH, J., dissenting), deterrence of governmental misconduct is not the sole purpose of the exclusionary rule. The exclusionary rule also ensures the integrity of judicial proceedings, Terry v Ohio, 392 US 1, 12-13; 88 S Ct 1868; 20 L Ed 2d 889 (1968), and closes the courthouse doors “to any use of evidence unconstitutionally obtained . . . .” Wong Sun v United States, 371 US 471, 486; 83 S Ct 407; 9 L Ed 2d 441 (1963). The district court never indicated that its ruling was calculated to remedy improper conduct by law enforcement officials; rather, it was a response tailored to the fact of the Sixth Amendment violation itself. It would impair the integrity of our judicial system if defendant’s statements could be introduced against him, despite a binding federal ruling that they had been obtained in violation of his Sixth Amendment rights.
*261 The exclusionary rule was applied here to afford defendant a fair trial, not to deter governmental misconduct, but the majority still reasons that the exclusionary rule should not apply to the evidence derived from defendant’s confession because no governmental misconduct occurred.[3] Ante at 251. But this fails to address the pertinent issue in applying the district court’s order — whether excluding the derivative evidence will “neutralize the taint” caused by the interrogation and provide defendant “the effective assistance of counsel and a fair trial.” Morrison, supra at 365. Further, it follows that the majority holds that the derivative evidence should not be excluded, when the majority flatly refuses to accept the validity of the district court’s order. If the majority does not agree, and cannot accept for the purposes of this case, that defendant’s interrogation constituted a Sixth Amendment violation that can be remedied by applying the exclusionary rule, it is not surprising that the majority finds no basis for excluding the evidence derived from that interrogation.[4] The exclusion of derivative evidence is *262 premised entirely on the existence of illegally obtained primary evidence. By rejecting the premise that the primary evidence should be excluded, the majority forecloses any possibility of holding that the derivative evidence should also be excluded.
II. DERIVATIVE EVIDENCE
Given that defendant’s statement must be excluded from evidence, this Court is presented with the question whether evidence derived from defendant’s interrogations, namely, the testimony of two street sweepers whom defendant identified during his conversations with the police, should also be excluded. In deciding whether derivative evidence is admissible, the relevant inquiry is “ ‘whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.’ ” Wong Sun, supra at 488, quoting Maguire, Evidence of Guilt, p 221 (1959). Derivative evidence may be admissible if the connection between the illegality and the evidence was “ ‘so attenuated as to dissipate the taint.’ ” Wong Sun, supra at 491, quoting Nardone v United States, 308 US 338, 341; 60 S Ct 266; 84 L Ed 307 (1939). For example, Wong Sun presented a situation where the defendant was illegally arrested, but lawfully arraigned and released on his own recognizance, and voluntarily returned to the authorities several days later to make a statement, and the statement was deemed sufficiently attenuated from the illegal arrest that it was deemed admissible. Id. In this case, defendant disclosed the identities of the street sweepers, Anthony Wright and *263 Wilbert Mack, during a postarraignment interrogation outside the presence of counsel. Defendant told officers that Wright and Mack gave him a ride home after the robbery. The prosecution located these witnesses, and they testified against defendant at his trial, stating that he had asked them for a ride home and sought change for a $50 bill. Defendant had also admitted to officers that codefendant Idell Cleveland gave him two $50 bills following the robbery.
Under the attenuation test of Wong Sun, the testimony of Wright and Mack should be excluded from evidence. Their identities were discovered as a direct result of the tainted interrogation. There was no intervening act of free will that dissipated the taint of the Sixth Amendment violation. The majority argues that Michigan v Tucker, 417 US 433; 94 S Ct 2357; 41 L Ed 2d 182 (1974), supports the opposite conclusion, but that case is inapplicable. In Tucker, the Court held that derivative witnesses could testify although the defendant’s own statement had been suppressed because it had been obtained after deficient Miranda[5] warnings. Id. at 436-437, 450. Notably, from the outset, the Tucker opinion distinguished Sixth Amendment violations from the case before it:
[Defendant] did not, and does not now, base his arguments for relief on a right to counsel under the Sixth and Fourteenth Amendments. Nor was the right to counsel, as such, considered to be persuasive by either federal court below. We do not have a situation such as that presented in Escobedo v. Illinois, 378 U.S. 478 [84 S Ct 1758; 12 L Ed 2d 977 (1964)], where the policemen interrogating the suspect had refused his repeated requests to see his lawyer who was then present at the police station. [Tucker, supra at 438.]
*264 Similarly, Tucker also distinguished Wong Sun:
But we have already concluded that the police conduct at issue here did not abridge respondent’s constitutional privilege against compulsory self-incrimination, but departed only from the prophylactic standards later laid down by this Court in Miranda to safeguard that privilege. [Id. at 445-446.]
In sum, Tucker made very clear that its holding was based on the condition that there was no constitutional violation, but merely a violation of what it perceived as a procedural safeguard designed to protect the constitutional right against self-incrimination. Because the present case involves a constitutional violation, defendant’s case is more analogous to Wong Sun than to Tucker.
But analysis under the rule of Wong Sun does not resolve the inquiry because in this case the derivative evidence is live-witness testimony, which requires special consideration. “[T]he exclusionary rule should be invoked with much greater reluctance where the claim is based on a causal relationship between a constitutional violation and the discovery of a live witness than when a similar claim is advanced to support suppression of an inanimate object.” United States v Ceccolini, 435 US 268, 280; 98 S Ct 1054; 55 L Ed 2d 268 (1978). Accordingly, in making its suppression decision, a court should take into account the unique factors presented by a live witness. For example, “[t]he greater the willingness of the witness to freely testify, the greater the likelihood that he or she [would have been] discovered by legal means ....” Id. at 276. Also, “the cost of excluding live-witness testimony” is often greater than the cost of excluding inanimate evidence, so a “more direct link between the illegality and that kind of testimony is required.” Id. at 278.
*265 Of course, Ceccolini does not stand for the proposition that live-witness testimony should never be excluded. It simply requires the court, when deciding whether discovery of the evidence is attenuated from the illegality, to scrutinize different factors than those in cases involving the exclusion of physical evidence. The court’s attenuation analysis should be “appropriately concerned with the differences between live-witness testimony and inanimate evidence ....” Id. at 278-279.
The first factor in live-witness cases considers the free will of a live witness. In part, it is related to the inevitable discovery doctrine, an exception to the exclusionary rule that allows the admission of illegally obtained evidence if the evidence would inevitably have been obtained through legal means.[6] Nix v Williams, *266 467 US 431, 443; 104 S Ct 2501; 81 L Ed 2d 377 (1984). The nature of live witnesses is that, unlike inanimate objects, they can approach the police voluntarily. But between the time of the murders and defendant’s confessions, approximately one week, Wright and Mack did not approach the police with information about defendant. This indicates that they did not connect defendant with the crime or were not aware of the murders. Also relevant to the degree of free will exercised by a witness is whether the illegality played any meaningful part in the witness’s willingness to testify. There is no indication that defendant’s illegal interrogation influenced Wright and Mack’s decision to testify. In sum, the application of the first Ceccolini factor gives mixed results that require balancing by the trial court.
The remaining live-witness factors balance the costs of excluding a live witness with the illegality. Live-witness testimony requires a closer connection to the illegality because “such exclusion would perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search or the evidence discovered thereby.” Ceccolini, supra at 277. But this factor is most relevant when the discovery of the live witness is incidental to the illegality. For example, in Ceccolini, a police officer discovered in an envelope evidence of a gambling operation while casually visiting with a store clerk. When the officer asked the clerk whom the envelope belonged to, the clerk identified Ceccolini, the defendant. At Ceccolini’s trial, both the contents of the envelope and the clerk’s testimony were suppressed on the basis that an illegal *267 search had occurred. The United States Supreme Court reversed, stating that “[w]hile the particular knowledge to which [the clerk] testified at trial can be logically traced back to [the officer’s] discovery of the policy slips, both the identity of [the clerk] and her relationship with the [defendant] were well known to those investigating the case.” Id. at 279.
In contrast to the situation in Ceccolini, the identities of the street sweepers were not known to investigators, nor were they likely to be uncovered in the course of the police investigation. Wright and Mack were strangers to defendant, so the police would have had no reason to interview them as his associates. While it is possible that the prosecution may be able to demonstrate to the contrary, it appears that the relationship between discovering the identities of the street sweepers and defendant’s illegal interrogation is not attenuated because the identities were revealed as a direct result of defendant’s interrogation.
The Court of Appeals was correct to remand this case to the trial court to consider the Ceccolini factors and determine whether the testimony of Wright and Mack would otherwise be admissible under the inevitable discovery doctrine. Because of the trial court’s initial ruling, the question whether the identities of the street sweepers would have been inevitably discovered was never addressed. Consequently, the prosecution should be given the opportunity to show that Wright and Mack would have been discovered regardless of defendant’s interrogation without counsel. Accordingly, I would affirm the decision of the Court of Appeals.
Kelly, J., concurred with Cavanagh, J.

 The majority suggests that these issues may be raised on appeal if defendant is convicted. But the federal district court order will always bind this particular case because the prosecution failed to appeal the ruling.

 The majority characterizes its discussion of Strickland v Washington, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984), and Cronic as an explanation of its reasoning. But the majority could have explained why the Court of Appeals statements are dicta without passing judgment on the underlying analysis. “It is not our duty to pass on moot questions or abstract propositions.” Sullivan v State Bd of Dentistry, 268 Mich 427, 429; 256 NW 471 (1934). I would exercise judicial restraint and reserve such in-depth analysis for a case that properly presents the issue for our review.

 I do not dispute that there was no evidence of police misconduct in this case. But as I have stated here and on other occasions, I disagree that the exclusionary rule is an appropriate remedy only when government misconduct has occurred.

 While the underlying Sixth Amendment violation is not a question that is properly before us, because of the majority’s extensive review of the matter, I find it appropriate to briefly rebut its account. Ample evidence supports the federal district court’s ruling. The defect in defense counsel’s performance was not merely advising his client to speak to the police despite being told that no plea agreements were being offered; counsel’s advice also prompted defendant to waive his right to have counsel present at the interrogation. Notably, at the hearing conducted pursuant to People v Ginther, 390 Mich 436; 212 NW2d 922 (1973), defense counsel was asked why he was not present during any of defendant’s interrogations. He responded, “I don’t know that they, one, they would have allowed me to be in there.” The validity of defendant’s waiver of counsel is seriously questionable when he was receiving advice *262 from an attorney who believed that his presence at his client’s postindictment interrogation was subject to approval by the police.

 Miranda v Arizona, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

 While Ceccolini does not hold that the discovery of a live witness may only be attenuated if that witness would have been inevitably discovered, the likelihood of discovering a live witness remains a significant factor. Ceccolini itself evokes the inevitable discovery doctrine when it notes that “[t]he greater the willingness of the witness to freely testify, the greater the likelihood that he or she will be discovered by legal means,” Ceccolini, supra at 276 (emphasis added), and that “a determination that the discovery of certain evidence is sufficiently... independent of the constitutional violation to permit its introduction at trial is not a determination which rests on the comparative reliability of that evidence,” id. at 278 (emphasis added). In applying the live-witness factors to Ceccolini’s case, the Court observed that “both the identity of [the witness] and her relationship with the respondent were well known to those investigating the case,” id. at 279, suggesting that the witness’s identity would have been discovered regardless of the illegality. Further, Justice Marshall recognized in his dissent that the Ceccolini factors bore resemblance to the inevitable discovery doctrine when he stated:
[T]he Court’s approach involves a form of judicial “double counting.” The Court would apparently first determine whether the evidence stemmed from an independent source or would inevitably have been discovered; if neither of these rules was found to apply, as here, the Court would still somehow take into account *266 the fact that, as a general proposition Glut not in the particular case), witnesses sometimes do come forward of their own volition. [Id. at 287-288 (Marshall, J., dissenting).]