# United States Navy-Marine Corps Court of Criminal Appeals

_____

**UNITED STATES**
*Appellee*

v.

**Hugo J. SPINOZA**
**Lieutenant, (O-3), U.S. Navy**
*Appellant*

_____

**No. 201700236**

_____

Appeal from the United States Navy-Marine Corps Trial Judiciary

*Argued:* 13 August 2018—*Decided:* 4 February 2019

_____

*Military Judges*:
Captain Beth Payton-O'Brien, JAGC, USN (arraignment);
Captain Paul C. Leblanc, JAGC, USN (trial).

*Approved Sentence:* Dismissal and a reprimand.[1] Sentence adjudged
21 March 2017 by a general court-martial convened at Naval Station
San Diego, California, consisting of officer members.

*For Appellant*:
Major Maryann N. McGuire, USMC (argued).

*For Appellee*:
Captain Luke Huisenga, USMC (argued);
Major Kelli A. O'Neil, USMC (on brief).

_____

---

[1] In our decretal paragraph, we disapprove the reprimand.

**This opinion does not serve as binding precedent,
but may be cited as persuasive authority under
NMCCA Rule of Practice and Procedure 30.2**

—————————————————

*Before WOODARD, TANG, and HITESMAN,[2]
Appellate Military Judges*

TANG, Judge:

A general court-martial convicted the appellant, contrary to his pleas, of stalking, assault, communicating a threat, fraternization, and unlawful entry in violation of Articles 120a, 128, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920a, 928, and 934. After findings, the military judge conditionally dismissed the assault and communicating a threat charges as unreasonably multiplied with the stalking charge.[3] The panel sentenced the appellant to a reprimand and a dismissal. The convening authority approved the adjudged sentence and, except for the dismissal, ordered it executed.

The appellant asserts three assignments of error, which we have reordered: (1) the evidence is factually insufficient for his unlawful entry conviction; (2) the evidence is factually insufficient for his stalking conviction; and (3) his defense counsel were ineffective for failing to seek suppression of evidence from his cell phone. We disagree. Additionally, although not raised by the parties, we note multiple errors in the Court-Martial Order (CMO). After careful consideration of the entire record, and in the interest of judicial economy, we will take appropriate action in our decretal paragraph.

## I. BACKGROUND

In July 2015, the appellant, a commissioned officer, met Sonar Technician Surface Third Class (STG3) AI while working as an Uber driver. He subsequently engaged in two separate consensual sexual encounters with her even though he knew she was a junior enlisted Sailor. In August 2015, while out drinking with STG3 AI, the appellant became heavily intoxicated. After STG3 AI helped the appellant back to his residence, she claims he sexually assaulted her.[4]

---

[2] Senior Judge Jones participated in the oral argument. However, final action was not taken in this case until after he detached from the court.

[3] Appellate Exhibit (AE) XXVII; Record at 996-98.

[4] The appellant was acquitted of this charge.

The Naval Criminal Investigative Service (NCIS) opened an investigation into the alleged sexual assault. On 9 September 2015, Special Agent M sought and received a Command Authorization for Search and Seizure (Command Authorization) of: (1) the appellant's cell phone for digital evidence of his improper relationship with STG3 AI; and (2) his person for his DNA.[5] Later that same day, Special Agent M interrogated the appellant.[6] Near the end of the interview, knowing that he had already secured the Command Authorization, Special Agent M sought consent from the appellant to search his phone. Special Agent M told the appellant, "Because your primary method of communication with [STG3 AI] was through your phone . . . I'd like to go through your phone, and search your phone . . . and conduct a thorough search."[7] The appellant asked "Are you just going to look at text messages between [STG3 AI] and I or—"[8] Special Agent M responded:

> I'm going to look for digital evidence of your relationship. Everything from . . . the Uber app when you guys met, to refine down when that happened, to anything that pertains to the investigation. But your phone is going to hold digital evidence of your communications with her and all those things.[9]

The appellant replied, "That's fine."[10] After he orally consented to a search of his phone, the appellant signed a Permissive Authorization for Search and Seizure form (Permissive Authorization).

After digital extraction of the appellant's phone proved unsuccessful, NCIS investigators conducted a manual review of the phone. During the review, investigators took over 140 screen shots of text message conversations between the appellant and ten other women. These conversations occurred during the same time period of the appellant's interactions with STG3 AI—July to September 2015. None of the texts were responsive to the allegations of sexual assault made by STG3 AI. But the texts did describe the

---

[5] The Command Authorization did not explicitly incorporate Special Agent M's request to *search* the appellant's cell phone, as Special Agent M had detailed in his supporting affidavit. However, we need not evaluate the validity of the Command Authorization because the appellant consented to a search of his cell phone.

[6] The video recording of this interview was entered into evidence as Prosecution Exhibit (PE) 13.

[7] PE 13 at 39:55.

[8] *Id.* at 40:20.

[9] *Id.* at 40:23.

[10] *Id.* at 40:40.

appellant's aggressive sexual behavior, his behavior while intoxicated, and his use of Uber customer information for personal purposes. The investigators used the information gleaned from the texts to identify and interview two women, LTJG MM and SM.

The appellant met LTJG MM through mutual friends, and the two socialized in group settings. One evening in April or May 2014, the appellant showed up uninvited at LTJG MM's apartment where she was hosting a party for a friend. LTJG MM did not invite the appellant into her apartment but told him she would see him later at some local bars she planned to patronize with her friends. But when the appellant approached LTJG MM at one of the bars that night, she gave him, as she termed it, the cold shoulder. Ultimately, LTJG MM returned to her apartment with another man she met that evening. The two retired to her bedroom. Sometime later, the appellant burst into LTJG MM's apartment and rushed up the stairs toward LTJG MM's bedroom. LTJG MM's roommate, a female junior Naval Officer, tried blocking the appellant from getting into LTJG MM's room, but he kept trying to push past her. The appellant was very angry that LTJG MM was in bed with the man. He repeatedly yelled at her, calling her a "slut[,] and a bitch[,] and a whore."[11] The two women and LTJG MM's male companion responded by repeatedly yelling and cursing at the appellant to leave. Finally, the appellant "stormed out of the apartment."[12] Both women testified the incident terrified them.

The NCIS investigators identified SM from a text the appellant had sent her apologizing for his behavior while intoxicated. When interviewed by NCIS, SM related that she had engaged in a "casual romantic relationship" with the appellant from June through August of 2015, and that he assaulted her in July 2015.[13] SM told investigators that she had been walking down the street with another man when the appellant saw her and aggressively grabbed her arm, trying to pull her away from her date, and told her in a loud voice that she had to go home with him. SM's date came to her defense. Eventually, nearby police intervened to separate the appellant and SM's date. SM testified the incident left her "scared and nervous."[14] But the appellant was not done.

---

[11] Record at 446.

[12] *Id.* at 459.

[13] *Id.* at 740.

[14] *Id.* at 742.

Over the rest of the night and into the morning, the appellant called and texted SM more than thirty times. Among other things, he called her vile names, threatened to tell her son she was a "whore," and threatened to break a window in her house and kill whomever she was in bed with. His threats left SM horrified and shaking. At one point, she texted the appellant warning him not to come to her house or she would call the police. SM finally went home around 2:30 a.m. Soon thereafter, the appellant showed up and began yelling at her and pounding on her door trying to get her to talk to him. Ultimately, he left—but only after SM pacified him by agreeing to see him again.

Additional facts necessary to resolution of the AOEs are included below.

## II. DISCUSSION

### A. Factual Sufficiency

The appellant asserts his convictions for unlawful entry and stalking are factually insufficient. We disagree.

We review questions of factual sufficiency *de novo*. Art 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is whether "after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [this court is] convinced of appellant's guilt beyond a reasonable doubt." *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017) (citation, internal quotation marks, and emphasis omitted). In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. Proof beyond a reasonable doubt does not mean, however, that the evidence must be free from conflict. *United States v. Goode*, 54 M.J. 836, 841 (N-M. Ct. Crim. App. 2001).

#### 1. Unlawful entry

The appellant was convicted of unlawfully entering LTJG MM's residence in violation of Article 134, UCMJ. The government was required to prove:

> (1) That the appellant entered the dwelling house of LTJG MM;
>
> (2) That such entry was unlawful; and

> (3) That, under the circumstances, the conduct of the appellant was of a nature to bring discredit upon the armed forces.[15]

The appellant does not dispute that he entered the dwelling house of LTJG MM. Instead, he argues his entry was neither unlawful nor service discrediting.

"An entry is 'unlawful' if made without the consent of any person authorized to consent to entry or without other lawful authority."[16] The appellant contends his entry was lawful because he entered LTJG MM's apartment to prevent a crime—the sexual assault of a drunken LTJG MM by her male companion. This claim is not supported by the record. Both LTJG MM and her roommate testified that LTJG MM only consumed a few drinks that entire evening and was not overly intoxicated. More importantly, the record shows the appellant acted out of possessiveness and rage, not concern for LTJG MM's well-being. After repeatedly being told to get out of LTJG MM's apartment, he yelled at her, calling her "a slut and a bitch and a whore" before eventually leaving.[17] We conclude from these statements that the appellant's motive in unlawfully entering LTJG MM's apartment was jealousy and not to protect her from a sexual assault.

The appellant next avers his actions were not service discrediting because "[t]here is no evidence [his] conduct ever made its way into the public domain."[18] This is factually incorrect. LTJG MM's male companion was a civilian. Regardless, our superior court has held that, when proving that conduct is service discrediting, public awareness of the conduct is not always required.

> [E]vidence that the public was actually aware of the conduct is not necessarily required. Furthermore, proof of the conduct itself *may* be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that, under all the circumstances, it was of a nature to bring discredit upon the armed forces.

*United States v. Phillips*, 70 M.J. 161, 163 (C.A.A.F. 2011) (emphasis in original).

---

[15] 10 U.S.C. § 934; MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.) (MCM), Part IV, ¶ 111.b; AE CIII at 9; Charge Sheet.

[16] MCM, Part IV, ¶ 111.c.

[17] Record at 446.

[18] Appellant's Brief of 5 Jan 2018 at 46.

Here, the appellant unlawfully entered LTJG MM's home in the middle of the night. He shoved past LTJG MM's roommate to get to LTJG MM, eventually bursting into her bedroom. He refused to leave the home and shouted profanities. We concur with the government that this "vulgar, terrifying violation of a female officer's privacy is the sort of gross personal misconduct the very nature of which is service discrediting."[19] After weighing all the evidence and making allowances for not having personally observed the witnesses, we are convinced beyond a reasonable doubt that the appellant is guilty of unlawful entry.

### 2. Stalking

The appellant was convicted of stalking SM in violation of Article 120a, UCMJ. The government was required to prove:

> (1) That the appellant wrongfully engaged in a course of conduct directed at SM that would cause a reasonable person to fear bodily harm, to wit: unlawfully grabbing SM on the arm with his hand, sending her text messages threatening to break into her home, and going to her home and attempting to enter it;

> (2) That the appellant knew or reasonably should have known that SM would be placed in a reasonable fear of bodily harm; and

> (3) That the appellant's acts did induce SM to feel reasonable fear of bodily harm. [20]

The appellant asserts that the government failed to prove any of the three elements.

The appellant contends the government did not prove the first element because there was no evidence he attempted to enter SM's home. While the appellant did repeatedly bang on her door, yell at her to come outside and talk to him, and called her on the phone, we agree that there is no evidence in the record that he ever attempted to enter the home. Accordingly, we disapprove the finding of guilty to the language "and attempting to enter it." We will take appropriate action on this language in our decretal paragraph.

Even with this exception, we still find that the government proved beyond a reasonable doubt the first element—that the appellant engaged in a *course*

---

[19] Appellee's Brief of 15 May 2018 at 38.

[20] 10 U.S.C. § 920a; MCM, Part IV, ¶ 45a.b.; AE CIII at 5; Charge Sheet.

*of conduct* directed at SM that would cause a reasonable person to fear bodily harm. A course of conduct includes "a repeated conveyance of verbal threats, written threats, or threats implied by conduct, or a combination of such threats, directed at or towards a specific person."[21] And "[t]he term 'repeated,' with respect to conduct, means two or more occasions of such conduct."[22] Here, the appellant accosted SM while she was on a date with another man, grabbed her arm, and escalated the confrontation to the point that law enforcement officials had to intervene. He repeatedly sent her text messages threatening to break her window, and to break into her home and kill whomever she was with. Further, he then traveled to her home, beat on her door, and yelled at her. SM testified she was "terrified," and "shaking" because she "[a]bsolutely" feared the appellant was going to hurt her.[23] We conclude her fear of bodily harm was reasonable.

The appellant also asserts the government failed to prove the second element—that the appellant knew, or should have known, that his actions would place SM in reasonable fear of bodily harm. The appellant makes three assertions. First, he claims that the misspellings in his texts that night prove he was so drunk he did not know—or could not have known—the consequences of his actions. We disagree. His course of conduct spanned several hours. The content of his threatening texts, his behavior at SM's home, and his later expressions of remorse all show the appellant knew or should have known the consequences of his actions towards SM. Second, the appellant claims that because he had been engaged in a relationship with SM, his actions could not cause SM to reasonably fear him. And third, the appellant avers that SM was only concerned for the safety of her son and nephew, who were present in the home, not her own safety. We reject these claims as not supported by the record.

Finally, the appellant argues that the government failed to prove the third element—that SM actually feared bodily harm. He claims that because SM used profanity directed at him that night, never called the police, eventually went to sleep, and continued to correspond with him after the incident, she did not fear him. But SM testified to the contrary—that the appellant's actions toward her caused her to be "terrified," and "shaking" because she "absolutely feared the appellant was going to hurt her."[24] In fact, their encounter began with the appellant assaulting her by grabbing her arm in

---

[21] MCM, Part IV, ¶ 45a.(b)(1)(B).

[22] *Id.* at ¶ 45a.(b)(2).

[23] Record at 745.

[24] Record at 745.

downtown San Diego, and then the appellant texted SM, before arriving at her house, that three of his friends died that week and he hoped she would suffer the same misfortune. We find SM's testimony compelling and supported by the evidence in the record. After weighing all the evidence and making allowances for not having personally observed the witnesses, we are convinced beyond a reasonable doubt that the appellant is guilty of stalking SM.

## B. Ineffective Assistance of Counsel

The appellant next claims that he received ineffective assistance of counsel because his trial defense counsel failed to seek suppression of evidence obtained from his cell phone. Specifically, the appellant claims his counsel were deficient because he claims a suppression motion would have resulted in the exclusion of *all evidence* that related to the offenses of stalking SM, assaulting SM, and threatening SM. The appellant makes this claim because NCIS agents had no knowledge of the appellant's relationship with SM before they searched the appellant's cell phone. After reading the appellant's messages with SM, agents interviewed her. SM described her relationship with the appellant and his offenses, and she provided screenshots of threatening messages the appellant sent her. Those messages, which were not found on the appellant's phone, were later admitted at trial. We do not find the counsel were ineffective.

We review claims of ineffective assistance of counsel *de novo. United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015). The appellant bears the burden and must clear "a high bar" to prevail on such a claim. *Id.* at 371. He must show: (1) that his counsel's performance was deficient and (2) that, but for his counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)).

When a claim of ineffective assistance of counsel arises from counsel's failure to move to suppress evidence, the appellant must show: (1) "that there is a reasonable probability that such a motion would have been meritorious;" and (2) "that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *United States v. Harpole,* 77 M.J. 231, 236 (C.A.A.F. 2018) (internal quotations omitted) (citing *United States v. McConnell,* 55 M.J. 479, 482 (C.A.A.F. 2001); *United States v. Loving,* 41 M.J. 213, 244 (C.A.A.F. 1994) (internal citations omitted)). Under the circumstances of this case, the appellant prevails only if he can show the military judge would have suppressed the results of the cell phone search—holding that neither the command authorization nor the appellant's consent justified the search—*and* he must show that the military judge would also

have prohibited SM's live witness testimony and admission of the text messages from her cell phone.[25] We find the appellant's claim of error fails.

### 1. *The scope of appellant's consent to search*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. CONST. amend IV. A warrantless search is "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). Voluntary consent to search is one exception to the warrant requirement. *Schneckloth v. Bustamonte,* 412 U.S. 218 (1973).

A person giving consent to search may limit his consent by placing limitations on "time, place, or property." MILITARY RULE OF EVIDENCE 314(e)(2), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.). A person may also limit the scope of consent to search. However, the onus is on the appellant to expressly limit the scope of his consent. Limitations will not be inferred, and the appellant's subjective intent does not control. *See United States v. Wallace,* 66 M.J. 5, 8 (C.A.A.F. 2008). "The scope of a search is generally defined by its expressed object." *Florida v. Jimeno,* 500 U.S. 248, 251 (1991) (quoting *United States v. Ross,* 456 U.S. 798, (1982)). The scope of consent is determined by "objective reasonableness," asking "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* at 251 (internal quotations and citations omitted). A person may withdraw consent "at any time." MIL. R. EVID. 314(e)(2). However, the law enforcement official is "entitled to clear notice that this consent has been withdrawn." *United States v. Stoecker,* 17 M.J. 158, 162 (C.M.A. 1984). The appellant, through counsel, withdrew consent on 30 October 2015—after Special Agent M had already manually searched his cell phone.[26]

The appellant further contends he limited the scope of his consent to "his communications" with STG3 AI and information from the Uber application.[27] We disagree.

When Special Agent M asked the appellant for consent to search his cell phone, he told the appellant he intended to conduct a "thorough search."[28]

---

[25] The government did not present any text messages from the appellant's cell phone. The government's case was based on SM's testimony and text messages she provided from her cell phone.

[26] Appellant's Motion to Attach, Appendix at 10.

[27] Appellant's Brief of 5 Jan 2018 at 16.

[28] *Id.* at 40:23.

The appellant specifically asked, "Are you just going to look at text messages between [STG3 AI] and I or—" to which Special Agent M responded, that he intended to look for "digital evidence" of their relationship, including information in the Uber application and "anything that pertains to the investigation."

At that time, the investigation related to the appellant's actions in using his position as an Uber driver to meet STG3 AI, cultivating an improper but consensual sexual relationship with her, and ultimately allegedly sexually assaulting her after he became belligerently drunk in public. At no time did Special Agent M state he would *only* review communications between the appellant and STG3 AI. Nor did the appellant, a Lieutenant and a graduate of the United States Naval Academy, ever expressly limit his consent to just the search of his phone for his messages with STG3 AI or his Uber application. After this exchange, the appellant completed a written consent form, authorizing Special Agent M to search his cell phone in relation to an investigation into "Article 120." Further, when completing the consent form, he did not write any limitations on the consent form.

It was within the scope of the appellant's consent, therefore, for Special Agent M to look for any witnesses who may have been present with the appellant and STG3 AI on the night of the alleged sexual assault. The record indicates STG3 AI kept trying to find the appellant's friends when she encountered him intoxicated in public in downtown San Diego. It was also reasonable for Special Agent M to search for any statements the appellant may have made to others about his relationship with STG3 AI or her allegation of sexual assault. Such statements could be consistent or inconsistent with his statements to NCIS, and could be inculpatory or exculpatory.

Although the appellant claims Special Agent M engaged in a general search, "indiscriminately rummag[ing]" though the appellant's cell phone, Special Agent M's reporting indicates he confined his search to the timeframe of the appellant's relationship with STG3 AI. The appellant submitted to this court Special Agent M's report documenting his review of the appellant's cell phone.[29] All entries describe messages sent between July 2015 and September 2015.[30] The appellant was convicted of having an improper relationship with STG3 AI beginning in July 2015, and STG3 AI accused him of sexually assaulting her on 1 August 2015. All screenshots of text messages with SM were dated in July and early August 2015. The screenshots were arranged in reverse chronological order, the way they would have been presented in the

---

[29] Appellant's Motion to Attach, Enclosure (3), at 9-10.

[30] *Id.*

appellant's cell phone. The screenshots contained messages indicating a possible romantic and sexual relationship between the appellant and SM and showed that SM felt "insecure" about the idea of sleeping with the appellant.[31] Conducting an "ex post reasonableness" analysis, we find Special Agent M's search to be reasonable within the scope of the appellant's consent. *United States v. Richards,* 76 M.J. 365, 370 (C.A.A.F. 2017).

Having determined that Special Agent M's search of the appellant's cell phone was conducted within the scope of the appellant's consent, we need not evaluate the validity of the Command Authorization. Even assuming *arguendo,* the trial defense counsel could have successfully moved the court to suppress the search of the appellant's cell phone—rejecting both the Command Authorization and the appellant's consent as bases for the search—it does not follow that the court would also suppress the testimony of SM and disallow presentation of evidence from her cell phone.

### 2. Suppression of live witness testimony

The appellant's counsel argues that if trial defense counsel moved to suppress the search of the appellant's cell phone, there would be no evidence to support three of the specifications, necessarily resulting in acquittal for stalking, assault, and communicating a threat.[32] We disagree.

If a military judge suppresses evidence as a result of a Fourth Amendment violation, the judge must determine whether derivative evidence must likewise be suppressed. The general test is whether the taint of the initial illegality has been sufficiently attenuated. The Supreme Court elucidated the test for fruit of the poisonous tree in *Wong Sun v. United States* as: "whether, granting establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." 371 U.S. 471, 488 (1963) (internal quotations and citation omitted). MILITARY RULE OF EVIDENCE 311 governs military practice and contains our exclusionary rule, which excludes evidence if "exclusion . . . results in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system."

---

[31] *Id.*, Enclosure (4), at 58.

[32] Although the appellant was convicted of stalking, assault and battery, and communicating a threat, all in relation to SM, the military judge conditionally dismissed the specifications alleging assault and battery and communicating a threat on the basis that they constituted an unreasonable multiplication of charges with stalking.

When evaluating whether witness testimony must be suppressed as fruit of an illegal search, the court must apply the factors described by the Supreme Court in *United States v. Ceccolini.* 435 U.S. 268 (1978). The test is not but-for causation. *See id.* at 275. "Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet." *Id.* at 276.

In evaluating whether witness testimony should be suppressed as fruit of the poisonous tree, the court must consider:

(1) The "degree of free will exercised by the witness," examining whether the witness testified of her own free will or whether her testimony was "coerced or even induced by official authority" as a result of the illegal search. *Ceccolini,* 435 U.S. at 276, 279.

(2) Whether "[s]ubstantial periods of time elapsed between the time of the illegal search and the initial contact with the witness, on the one hand, and between the latter and the testimony at trial on the other;" *Id.* at 279.

(3) Whether illegally seized evidence was used to question the witness; *Id.*

(4) Whether the law enforcement officer deliberately conducted an illegal search; *See id.* at 280.[33]

(5) And the court must weigh the "cost of permanently silencing" the witness balanced against the deterrent effect against law enforcement misconduct. *Id.* at 280.

In assessing these factors, we find it unlikely that the military judge would have suppressed SM's testimony even if he had suppressed the results of the search of the appellant's cell phone. First, SM testified out of her own free will. In fact, SM told NCIS agents the appellant contacted her even *before* NCIS agents interviewed her. The appellant informed her she was free *not* to cooperate with law enforcement. Not only did she elect to submit to an interview, she revealed the appellant's prior contact with her. Second, nearly three months passed between the search of the appellant's phone and SM's first interview with NCIS in December 2015, and an even longer period of

---

[33] Our sister service courts have summarized this factor as the "purpose and flagrancy" of the law enforcement conduct. *See United States v. Jones,* 64 M.J. 596 (A. Ct. Crim. App. 2007), *United States v. Mancini,* No. 38783, 2016 CCA LEXIS 660 (A.F. Ct. Crim. App. 7 Nov 2016) (unpub. op.). The Supreme Court evaluated whether the law enforcement agent "entered the shop or picked up the envelope with the intent of finding tangible evidence bearing on an illicit gambling operation," or with "the intent of finding a willing and knowledgeable witness to testify against respondent." *Ceccolini,* 435 U.S. at 280.

time until she testified at trial on 15 March 2017.[34] Third, the agents did not confront SM with the threatening text messages that were ultimately admitted at trial as Prosecution Exhibit 11A—the threatening text messages were not found on the appellant's cell phone, but rather on SM's cell phone. The NCIS report documenting the agents' interview with SM does not indicate that they showed SM any messages at all, but shows that they interviewed her and that she gave them screenshots of her messages with the appellant.[35] Having found the search was validly conducted within the scope of the appellant's consent, we conclude there is no flagrant police misconduct. Finally, conducting a cost-benefit analysis, we do not believe any possible good resulting from "permanently silencing" SM justifies any theoretical deterrent effect. Accordingly, we do not believe the trial outcome would have been different if the trial defense counsel had raised this motion. Therefore, we find the appellant's claim of ineffective assistance of counsel fails.

## C. Sentence Reassessment

Having disapproved language in Charge III, Specification 1, we must now consider whether we can reassess the sentence. *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013); *United States v. Moffeit*, 63 M.J. 40, 41-42 (C.A.A.F. 2006); *United States v. Sales*, 22 M.J. 305, 307-08 (C.M.A. 1986). After analyzing the four factors laid out by our superior court in *Winckelmann,* we can confidently and reliably determine that the appellant's sentence would still include a dismissal and a reprimand.

Although, we believe that the appellant's sentence of a dismissal and letter of reprimand are appropriate, in the interest of judicial economy, we nonetheless disapprove the letter of reprimand in our decretal paragraph. We do so because the letter of reprimand issued to the appellant by the convening authority references the disapproved language contained in Charge III, Specification 1.[36]

---

[34] Both time periods are longer than those in *United States v. Richards,* 2016 CCA LEXIS 285 at *41 (A.F. Ct. Crim. App. 2 May 2016) (unpub. op.) (affirming the military judge's denial of a defense motion to suppress live witness testimony when the witness was first contacted 26 days after an illegal search and testified "over a year later."). *See also United States v. Mancini,* 2016 CCA LEXIS 660 at *33-34 (A.F. Ct. Crim. App. 7 Nov 2016) (unpub. op.) (finding a military judge would not have excluded live witnesses' testimony when witnesses testified of "their own free will" "over a year after they were identified.")

[35] *See* AE XIX, Enclosure (B).

[36] Specifically, the letter stated, in pertinent part, "Your misconduct consisted of wrongfully engaging in a course of conduct towards a civilian that included unlawful-

**D. Errors in Promulgating Order**

An appellant is entitled to an official record accurately reflecting the results of his proceedings. *United States v. Crumpley,* 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1989). We test error in court-martial orders under a harmless-error standard. *Id.*

At a minimum, a court-martial promulgating order must contain the following information: (1) the type of court-martial and the convening command; (2) *a summary of all charges and specifications on which the appellant was arraigned*; (3) the *appellant's pleas*; (4) the findings or *disposition of all charges and specifications on which the appellant was arraigned*; (5) if adjudged, the sentence; and (6) a summary of the action taken by the CA in the case. R.C.M. 1114(c)(1).

Although not raised as error, we note that the promulgating order is incorrect in the following ways:

(1) It refers to the charges and specifications based on the numbering reflected in the amended cleansed charge sheet[37] rather than the charges and specifications as numbered in the charge sheets at the time the appellant was arraigned.

(2) It fails to reflect all charges and specifications on which the appellant was arraigned and entered pleas. The appellant entered pleas of not guilty to all charges and specifications.

(3) It fails to reflect the merger, consolidation, and dismissal of several charges and specifications which the military judge found to be an unreasonable multiplication of charges for findings. Based upon this ruling, the military judge dismissed Charge II, Specification 2, Charge IV, Specification 1, and Additional Charge I and its sole specification. The military judge merged the operative language of these offenses into a new consolidated sole specification of Charge II alleging the appellant's aggravated sexual contact against STG3 AI.[38]

---

ly grabbing her arm, threatening her and another individual, and attempting to enter her home, thereby inducing a reasonable fear of bodily harm." Punitive Letter of Reprimand of 17 Jul 2017.

[37] AE CIV.

[38] The consolidated specification read: "In that Lieutenant Hugo J. Spinoza, U.S. Navy, Mine Countermeasures Squadron Three, on active duty, did, at or near San Diego, California, on or about 1 August 2015, commit sexual contact upon STG3, A.I., U.S. Navy, to wit: biting STG3 A.I.'s lower lip, neck, and nipple with his mouth, strangling STG3 A.I.'s neck with his hand until she lost consciousness, and biting

(4) It fails to state that after findings the military judge conditionally dismissed Charge IV, Specification 2 and Charge VI, Specification 1, finding them to be an UMC for sentencing with Charge III, Specification 1.

(5) It does not correctly reflect the members' finding on the sole specification of Additional Charge II, for which the members excepted the word "March" and substituted the words "on or about May."

(6) Finally, it does not reflect that the appellant was arraigned on and entered pleas of not guilty to the sole specification of Charge I and Charge III, Specification 2. Nor does it reflect that the military judge entered findings of not guilty to these offenses pursuant to R.C.M. 917.[39]

The failure to reflect the omitted information in the promulgating order was error; however, the error was harmless as it did not materially prejudice the appellant's substantial rights. To ensure the appellant has an official record which accurately reflects his proceedings, in our decretal paragraph we will order that the supplemental promulgating order reflect the omitted information.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence as modified above are correct in law and fact and that no error materially prejudicial to the appellant's substantial rights occurred. Art. 59(a) and 66(c), UCMJ. Accordingly, the findings and sentence, as modified above, are **AFFIRMED**.

The supplemental order shall reflect the following: (1) An accurate summary of all charges and specifications on which the appellant was arraigned and reflect the pleas he entered to these offenses; (2) An accurate summary of the findings or disposition of all offenses on which the appellant was arraigned and entered pleas; and (3) the affirmed sentence of this court. Due to the extensive inaccuracies of the original CMO, the court has provided an aide in drafting the supplemental CMO in Appendix A to this opinion.

Chief Judge WOODARD and Judge HITESMAN concur.

---

STG3 A.I.'s vagina with his mouth, by unlawful force, to wit: grabbing STG3 A.I.'s hair and pulling her head back, holding STG3 A.I. down on the bed, and applying pressure on STG3 A.I's neck with his left hand until she lost consciousness."

[39] The trial counsel improperly noted on the charge sheet that these offenses were withdrawn and dismissed without prejudice by the military judge. The legal effect of the military judge's ruling is a finding of not guilty to the offenses. R.C.M. 917(f).



FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

17

**Appendix A**

Charge I: Violation of the UCMJ, Article 80

Plea: Not Guilty

Finding: Not Guilty pursuant to R.C.M. 917.

Specification: In that Lieutenant Hugo J. Spinoza, U.S. Navy, Mine Countermeasures Squadron Three, on active duty, did, at or near San Diego, California, on or about July 2015, unlawfully break and enter the dwelling house of Ms. S.M., with intent to commit assault therein.

Plea: Not Guilty

Finding: Not Guilty pursuant to R.C.M. 917.

Charge II: Violation of the UCMJ, Article 120

Plea: Not Guilty

Finding: Not Guilty

Specification 1: In that Lieutenant Hugo J. Spinoza, U.S. Navy, Mine Countermeasures Squadron Three, on active duty, did, at or near San Diego, California, on or about 1 August 2015, commit sexual contact upon STG3 A.I., U.S. Navy, to wit: biting her right nipple, by unlawful force, to wit: by strangling STG3 A.I. with his left hand and holding her down on the bed.

Plea: Not Guilty

Disposition: The specification was dismissed. However, the military judge merged the operative language of this specification with the operative language from Charge II, Specification 2, Charge IV, Specification 1, and the sole specification of Additional Charge I, into the following specification under Charge II, alleging a violation of Article 120, UCMJ.

**Specification: In that Lieutenant Hugo J. Spinoza, U.S. Navy, Mine Countermeasures Squadron Three, on active duty, did, at or near San Diego, California, on or about 1 August 2015, commit sexual contact upon STG3, A.I., U.S. Navy, to wit: biting STG3 A.I.'s lower lip, neck, and nipple with his mouth, strangling STG3 A.I.'s neck with his hand until she lost consciousness, and biting STG3 A.I.'s vagina with his mouth, by unlawful force, to wit: grabbing STG3 A.I.'s hair and pulling her head back, holding STG3 A.I. down on the bed, and applying pressure on STG3 A.I's neck with his left hand until she lost consciousness.

Finding: Not Guilty.

Specification 2: In that Lieutenant Hugo J. Spinoza, U.S. Navy, Mine Countermeasures Squadron Three, on active duty, did, at or near San Diego, California, on or about 1 August 2015, commit sexual contact upon STG3 A.I., U.S. Navy, to wit: biting her vagina, by first rendering her unconscious.

Plea: Not Guilty

Disposition: The specification was dismissed. However, the military judge merged the operative language of this specification with the operative language from Charge II, Specification 1, Charge IV, Specification 1, and the

sole specification of Additional Charge I, into the specification noted above at ** under Charge II, alleging a violation of Article 120, UCMJ. The finding to the offense was Not Guilty.

Charge III: Violation of the UCMJ, Article 120a

Plea: Not Guilty

Finding: Guilty

Specification 1: In that Lieutenant Hugo J. Spinoza, U.S. Navy, Mine Countermeasures Squadron Three, on active duty, who should have known that Ms. S.M. would be placed in reasonable fear of bodily harm to herself, did, at or near San Diego, California, on or about July 2015, wrongfully engage in a course of conduct directed at Ms. S.M., to wit: unlawfully grabbing Ms. S.M. on the arm with his hand, sending her text messages threatening to break into her home, and going to Ms. S.M.'s home and attempting to enter it, thereby inducing in Ms. S.M. a reasonable fear of bodily harm to herself.

Plea: Not Guilty

Finding: Guilty, except for the words "and attempting to enter it." Of the excepted words, Not Guilty. Of the specification as excepted, Guilty.

Specification 2: In that Lieutenant Hugo J. Spinoza, U.S. Navy, Mine Countermeasures Squadron Three, on active duty, who should have known the LTJG M.M., U.S. Navy, would be placed in reasonable fear of bodily harm to herself, did, at or near San Diego, California, on divers occasions on or about March 2014, wrongfully engage in a course of conduct directed at LTJG M.M., to wit: arriving unannounced at her residence on more than one occasion and breaking into her residence, thereby inducing in LTJG M.M. a reasonable fear of bodily harm to herself.

Plea: Not Guilty

Finding: Not Guilty pursuant to R.C.M. 917.

Charge IV: Violation of the UCMJ, Article 128

Plea: Not Guilty

Finding: Guilty

Disposition: The charge was conditionally dismissed after findings as unreasonably multiplicious with the finding of Guilty to Charge III, Specification 1.

Specification 1: In that Lieutenant Hugo J. Spinoza, U.S. Navy, Mine Countermeasures Squadron Three, on active duty, did, at or near San Diego, California, on or about 1 August 2015, unlawfully bite STG3 A.I., U.S. Navy on her lower lip and neck with his mouth.

Plea: Not Guilty

Disposition: The specification was dismissed. However, the military judge merged the operative language of this specification with the operative language from Charge II, Specifications 1 and 2, and the sole specification of

Additional Charge I, into the specification noted above at ** under Charge II, alleging a violation of Article 120, UCMJ. The finding to the offense was Not Guilty.

Specification 2: In that Lieutenant Hugo J. Spinoza, U.S. Navy, Mine Countermeasures Squadron Three, on active duty, did, at or near San Diego, California, on or about July 2015, unlawfully grab Ms. S.M. on the arm with his hand.

Plea: Not Guilty

Finding: Guilty

Disposition: Conditionally dismissed after findings as unreasonably multiplicious with the finding of Guilty to Charge III, Specification 1.

Charge V: Violation of the UCMJ, Article 133

Plea: Not Guilty

Disposition: Withdrawn and dismissed without prejudice. However, as a result of the findings to Charge II and Charge VI, Specification 2, the legal effect of these findings renders the dismissal with prejudice.

Specification: In that Lieutenant Hugo J. Spinoza, U.S. Navy, Mine Countermeasures Squadron Three, on active duty, did, at or near San Diego, California, on divers occasions between on or about July 2015 and on or about August 2015 commit misconduct to wit: aggravated sexual contact and fraternization, which conduct was unbecoming an officer and a gentleman.

Plea: Not Guilty

Disposition: Withdrawn and dismissed without prejudice. However, as a result of the findings to Charge II and Charge VI, Specification 2, the legal effect of these findings renders the dismissal with prejudice.

Charge VI: Violation of the UCMJ, Article 134

Plea: Not Guilty

Finding: Guilty

Specification 1: In that Lieutenant Hugo J. Spinoza, U.S. Navy, Mine Countermeasures Squadron Three, on active duty, did, at or near San Diego, California, on or about July 2015, wrongfully communicate to Ms. S.M. a threat to injure her date by texting her he would come to her house, break in, and kill her date, such conduct being of a nature to bring discredit upon the armed forces.

Plea: Not Guilty

Finding: Guilty

Disposition: Conditionally dismissed after findings as unreasonably multiplicious with the finding of Guilty to Charge III, Specification 1.

Specification 2: In that Lieutenant Hugo J. Spinoza, U.S. Navy, Mine Countermeasures Squadron Three, on active duty, did, at or near San Diego, California, on or about July 2015, knowingly fraternize with STG3 A.I., U.S.

Navy, an enlisted person, on terms of military equality, to wit: by having sexual intercourse with STG3 A.I., in violation of the custom of the Naval Service of the United States that officers shall not fraternize with enlisted persons on terms of military equality, such conduct being of a nature to bring discredit upon the armed forces.

Plea: Not Guilty

Finding: Guilty

Specification 3: In that Lieutenant Hugo J. Spinoza, U.S. Navy, Mine Countermeasures Squadron Three, on active duty, was, at or near San Diego, California, on or about 26 March 2016, drunk and disorderly, such conduct being of a nature to bring discredit upon the armed forces.

Plea: Not Guilty

Disposition: Withdrawn and dismissed without prejudice.

Additional Charge I: Violation of the UCMJ, Article 128

Plea: Not Guilty

Disposition: The charge was dismissed. However, the military judge merged the operative language of the specification under the charge with the operative language from Charge II, Specifications 1 and 2, and Charge IV, Specification 1, into the specification noted above at ** under Charge II, alleging a violation of Article 120, UCMJ. The finding to the offense was Not Guilty.

Specification: In that Lieutenant Hugo J. Spinoza, U.S. Navy, Mine Countermeasures Squadron Three, on active duty, did, at or near San Diego, California, on or about 1 August 2015, commit an assault upon STG3 A.I., U.S. Navy, by strangling her with force likely to produce death or grievous bodily harm, to wit: applying pressure on her neck with his left hand until she lost consciousness.

Plea: Not Guilty

Disposition: The specification was dismissed. However, the military judge merged the operative language of this specification with the operative language from Charge II, Specifications 1 and 2, and Charge IV, Specification 1, into the specification noted above at ** under Charge II, alleging a violation of Article 120, UCMJ. The finding to the offense was Not Guilty.

Additional Charge II: Violation of the UCMJ, Article 134

Plea: Not Guilty

Finding: Guilty

Specification: In that Lieutenant Hugo J. Spinoza, U.S. Navy, Mine Countermeasures Squadron Three, on active duty, did, at or near San Diego, California, in March 2014, unlawfully enter the dwelling house of LTJG M.M., U.S. Navy, such conduct being of a nature to bring discredit upon the armed forces.

Plea: Not Guilty

Finding: Guilty, except for the word "March," substituting therefor the words "on or about May." Of the except word, Not Guilty. Of the specification as excepted and substituted, Guilty.